UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 AUG -1 PH 3: 37

DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| REGINALD WRIGHT, DONALD OPIE, and ANGELA WHITTER, on behalf themselves and all others similarly situated, | } } } } } | |
| **Plaintiffs,** | } } } | |
| v. | } } | CASE NO. CV 97-B-0776-S |
| CIRCUIT CITY STORES, INC., | } } } | |
| **Defendant.** | } } } | |

ENTERED

AUG 1 2001

## MEMORANDUM OPINION

Currently before the court is the Motion for Class Certification filed by plaintiffs Reginald Wright ("Wright"), Mark Kerce,[1] Donald Opie ("Opie"), and Angela Whitter ("Whitter")[2] on behalf of themselves and all others similarly situated. Plaintiffs filed this class action against Circuit City Stores, Inc. ("Circuit City" or "defendant") seeking to "redress the deprivation of plaintiffs' civil rights under 42 U.S.C. § 1981, as amended by § 101 of the Civil Rights Act of 1991, and 42 U.S.C. § 1985(3),"[3] and seeking "declaratory and injunctive relief against [defendant] to forbid [defendant] from continuing its pattern and practice of employment

---

[1] On February 5, 2001, the court granted Circuit City's Motion to Compel Arbitration of the Claims of Mark Kerce, based on the Associate Issue Resolution Program ("AIRP"), and dismissed his claims. The claims of Ruth Burden and Frank Barmore were dismissed by Order dated February 9, 2000.

[2] Collectively, Wright, Opie, and Whitter will be referred to as "plaintiffs."

[3] By Order entered June 12, 2000, the court dismissed with prejudice plaintiffs' conspiracy claims under 42 U.S.C. § 1985(3).

114

discrimination based on race."[4]  (Amended Complaint ("Am. Compl.") at ¶ 1.)  Upon

consideration of the motion, the submissions of the parties, the arguments of counsel, and the

relevant law, the court is of the opinion that plaintiffs' Motion for Class Certification is due to be

denied.

## I.  FACTUAL SUMMARY

### A.    Defendant's Organizational Structure

Defendant operates more than 600 hundred stores in four divisions: the Southern

Division, the Western Division, the Central Division, and the Northeast Division.  (DX[5] A at

¶ 3.)  Within the divisional structure, in descending order, are regions, districts, and stores.  (Id.

at ¶¶ 3, 5.)  In ascending order, Store Managers report to District Managers, who report to the

General Manager of each region, who, in turn, report to the Division President.  (Id. at ¶ 7.)

From 1991 to 1996, defendant operated between 125 and 160 stores in the Southern Region.  (PX

7 at 56-58.)  While the states within the Southern Division have not always remained the same,

as many as fifteen states have been included within the Southern Division since 1991.  (DX A at

---

[4]  Plaintiffs "withdrew their class claim for compensatory and punitive damages in order
to avoid the prolonged litigation that would have flowed from consideration over the proper
meaning and application of *Allison v. Citgo Petroleum,* 151 F.3d 402 (5th Cir. 1998)."
(Plaintiff's Brief in Support of Motion for Class Certification ("Pl.'s Br.") at 1 n.1; *see also*
Plaintiffs' Notice of Withdrawal of Claims for Compensatory and Punitive Damages.)  Plaintiffs,
however, are still seeking back pay and injunctive relief.  (*See* Pl.'s Br. at 21.)

[5]  Defendant filed its Evidentiary Submission in Support of Defendant's Opposition to
Plaintiffs' Motion for Class Certification on February 14, 2001.  References to this evidence will
be referred to throughout this Memorandum Opinion as "DX, " followed by the corresponding
tab letter.  Plaintiffs attached their evidentiary submission to Plaintiffs' Brief in Support of
Motion for Class Certification submitted to the court on October 16, 2000.  Plaintiffs then filed a
Motion to Supplement Plaintiffs' Brief on Class Certification with Copies of Deposition
Excerpts, which the court granted on January 23, 2001.  References to plaintiffs' evidence will
be referred to as "PX," followed by the corresponding tab number.

¶ 4.)

Within each store operated by defendant, there are multiple departments that correspond to the product lines, functions, and services provided by defendant.[6] (DX A at ¶ 11.) Further, each store maintains its own management hierarchy. (*See id.* at ¶ 8.) There are two prongs in the management hierarchy: the sales prong and the operations prong. The management hierarchy for sales moves from Sales Counselor, a 100% commissioned work force, to Sales Manager, and then to Store Manager. (*Id.* at ¶ 9.) The management hierarchy for operations moves from Customer Service Representative, a 100% hourly paid work force, to Customer Service Manager, and then to Operations Manager. (*Id.* at ¶ 10.) An Operations Manager cannot advance to Store Manager without first obtaining sales experience. (*Id.*)

Defendant has maintained an equal employment opportunity policy throughout the entire liability period asserted in this action. (DX A ¶ 13.) Since 1994, defendant has promoted employees to entry level management positions through a procedure that has included a written expression of interest form known as a Management Interest Questionnaire ("MIQ"). (*Id.* at ¶ 14.) MIQs are freely available in each store from Human Resources representatives. (*Id.* at ¶ 15.)[7]

Beginning in March 1995, defendant introduced the Associate Issue Resolution Program ("AIRP" or "arbitration program") to all employees. (DX G at ¶ 2.) Circuit City provided a

---

[6] These departments are ACE (which sells small electronic products), Audio, Car Stereo, Majors (which sells large appliances), SOHO (which sells office equipment), and Video. (DX A at ¶ 11.) The Majors department was phased out in 2000. (*Id.* at ¶ 12.)

[7] Defendant made available to plaintiffs approximately 377 MIQs during the course of discovery, but plaintiffs requested fewer than fifteen percent of these MIQs. (*See* DX C at ¶¶ 3-6.)

scripted presentation of the program, a videotape describing the program, and written materials explaining the program in detail, including the rules governing arbitration. (*Id.* at ¶¶ 6-7.) The materials explained that, while participation was voluntary, the employee would be bound by the arbitration provision in the AIRP if he or she did not opt out within thirty days by mailing a completed Opt Out Form to the Arbitration Coordinator at Corporate Headquarters in Richmond, Virginia. (*Id.* at ¶¶ 7, 8.) Plaintiffs Wright, Whitter, and Opie all timely opted out of the AIRP. (*Id.* at ¶ 9.)

Also beginning in March 1995, defendant included an arbitration agreement in its employment application. (*Id.* at ¶ 12.) Since that time, defendant has considered for employment only those applicants who completed the arbitration agreement as part of the application process. (*Id.*) The arbitration agreement covers all employment-related legal issues concerning application and/or candidacy for employment, employment, and termination of employment. (*Id.*) Applicants who initially agree to mandatory final and binding arbitration of all employment-related legal disputes may withdraw their consent to arbitration and their application for employment within three days of completing the arbitration agreement. (*Id.*) As a result, all employees hired since March 1995, have agreed to resolve any and all claims, disputes, or controversies arising out of or relating to their employment with defendant exclusively by final and binding arbitration. (*Id.* at ¶¶ 13-14.)

**B.      Plaintiffs**

      *1.      Wright*

Wright worked for defendant from November 1989, through May 1995. (Am. Compl. at ¶ 4.) Throughout his employment, Wright worked as a Sales Counselor in the Irondale store in

Birmingham, Alabama. (*Id.*; *see also* DX D at 32-34, 45-46.) Wright's claims are summarized as follows: (1) he was assigned to the ACE department, which is a less desirable and lower paying department than other sales departments, (DX D at 321); (2) defendant failed to transfer him to either the Audio department or the Video department, (*id.* at 60-62); (3) defendant failed to train him as a Sales Manager, (Am. Compl. at ¶¶ 23, 25, 26; DX D at 346-47); (4) defendant failed to promote him to Sales Manager, (Am. Compl. at ¶ 25); (5) defendant sent less qualified Sales Counselors to Sales Manager training,[8] (Am. Compl. at ¶ 26; DX D at 365-70); (6) defendant promoted two less experienced Sales Counselors to Sales Manager, (DX D at 369-70); and (7) defendant promoted several Sales Counselors to Sales Manager who had poor sales numbers,[9] (Am. Compl. at ¶ 29-30; DX D at 373-74).

Defendant terminated Wright in May of 1995, for poor productivity. (*See* Am. Compl. at ¶ 28; DX D at 126, 138.) Wright contends that defendant permitted white Sales Counselors with low productivity to transfer to other departments or, alternatively, that defendant is to blame for his low productivity by not scheduling him to work at "peak" times, denying him permission to discount prices, and assigning him extra duties. (Am. Compl. at ¶¶ 29-30; DX D at 60-62, 81-85, 126, 169, 211-12, 373-74.) Wright does not dispute, however, that defendant gives sales volume "high consideration" in evaluating Sales Counselor performance, that defendant determines such volume with reference to sales "numbers," and that he was in the bottom ten

---

[8] However, Wright could only identify two Sales Counselors, and only one by name, who received Sales Manager training even though less qualified than he. (*See* DX D at 365-69.) Further, Wright conceded that the unnamed individual had a better sales record than he. (*See id.*)

[9] However, Wright could not identify any specific individual who was promoted from Sales Counselor to Sales Manager despite poor sales numbers. (*See* DX D at 373-74.)

percent of Sales Counselors for the entire ten months preceding his termination. (*See* DX D at 73-80, 126.)

Wright has no knowledge regarding defendant's policy or practice in other stores, and can only speculate that his experiences at the Irondale store are "common to other stores in the Southern Division." (DX D at 138, 245.) Wright did not seek a promotion to any position in operations, as did Whitter. (*Id.* at 203; *see also* DX E at 90; Am. Compl. at ¶ 83.) Around the beginning of 1999, Wright plead guilty to a misdemeanor for possession of a forged instrument. (DX D at 19-20.)

### 2. *Whitter*

Whitter worked for Circuit City from October 1993, through December 1995. (Am. Compl. at ¶ 9.) Throughout this period, Whitter worked as a Sales Counselor in the Car Stereo and Majors departments in the Durham, North Carolina store. (Am. Compl. at ¶¶ 9, 82; DX E at 16.) Whitter was the number one Sales Counselor in the Car Stereo department in North Carolina and South Carolina, and she was number six in the entire Southern Division. (Am. Compl. at ¶ 83.) Whitter first requested management training in March of 1995, because she wanted to transfer into the Operations Department. (*Id.*)

Whitter's claims are summarized as follows: (1) the Car Stereo department is not profitable, (DX E at 111);[10] (2) a white employee received Sales Counselor training that defendant denied Whitter when she transferred from the Car Stereo department to the Majors department, (Am Compl. at ¶ 84; DX E at 145, 160); (3) Whitter expressed interest in a transfer

---

[10] However, Whitter conceded that the Majors department, the other department in which she worked, is desirable, if one has proper training and knowledge. (DX E at 111.)

from sales to operations in March 1995, nine months before her last day of employment in

December 1995, but her Sales Manager and Store Manager denied her request and transferred

three white employees instead, (Am. Compl. at ¶ 83; DX E at 62-63, 184-85, 258-63); (4) two

white employees received operations training for which she had put in a request, (DX E at 141-

42, 145, 238); (5) a Sales Manager and an Operations Manager unfairly disciplined Whitter in

order to prevent her from going to management training and securing a promotion, (Am. Compl.

at ¶¶ 84-86; DX E at 54-55, 260-63); (6) defendant failed to promote her to Operations Manager,

(Am. Compl. at ¶ 83; DX E at 90); and (7) a Sales Manager imposed unfair work schedules on

her and denied her requested schedule modifications, while five white Sales Counselors were

permitted to modify their schedules, (DX E at 104-05, 263-64.)  Whitter's exclusive sources of

information for her assertions of class-based discrimination are her experiences at the Durham

store and her reading of the Amended Complaint.  (*Id.* at 264-65.)

### 3.    *Opie*

Opie worked for defendant from October 1984, through March 1996.  (Am. Compl. at

¶ 7.)  Throughout this period, Opie worked in two stores in North Carolina, the Winston-Salem

store and the Greensboro store, and two stores in Atlanta, Georgia, the Memorial Drive store and

the North Point store.  (*See id.*)  During the time that Opie worked at the Winston-Salem and

Greensboro stores, North Carolina was part of the Central Division, not the Southern Division.

(*See* Am. Compl. at ¶ 65; DX F at 33.)  Opie worked in the Audio and Video departments[11] as a

Sales Counselor.  (DX F at 19, 21.)  Defendant promoted Opie from Sales Counselor to Sales

---

[11] The court notes that Wright claims that defendant discriminatorily denied him a
transfer to these departments based on his race.  (*See* DX D at 60-62.)

Manager in 1988 or 1989, while he was employed at the Winston-Salem store. (Am. Compl. at ¶ 63.) In 1989, Opie was transferred to the Greensboro store where he remained as Sales Manager for about four years. (*Id.* at ¶ 65.) Subsequently, as a result of a realignment of the North Carolina region into the Southern Division, defendant transferred Opie to a store in Atlanta. (*Id.*) At this time, defendant informed Opie that if he performed well, he would be in line to become Store Manager. (*Id.*) Opie was assigned to a different store in Atlanta than the one he had been promised. (*Id.* at ¶ 66.)

Opie's claims are summarized as follows: (1) the Memorial Drive store was in a bad business location,[12] (*id.* at ¶ 66); (2) defendant denied his requested transfer out of the Memorial Drive store,[13] (*id.* at ¶ 67; DX F at 146-48); and (3) defendant denied his request for training to become a Store Manager,[14] (*id.* at ¶¶ 68-70).

Opie does not claim that he was discriminated against during the four years that he worked at the Greensboro store. (DX F at 148.) Further, defendant sent Opie to entry-level management training and promoted him to entry-level management as a Sales Manager.[15] (*Id.* at

---

[12] However, Opie acknowledged that he requested a transfer to Atlanta, and, when offered, accepted a transfer to the Memorial Drive store – the same store that he now claims to be in a geographically undesirable location. (*See* DX F at 33-34, 123-24, 146.)

[13] Opie acknowledges that when he requested a transfer out of the Memorial Drive store, his performance was not good. (DX F at 146-48.)

[14] Opie acknowledges, however, that although he believes that he was assured before his transfer to the Memorial Drive store that he "would be in line to become a store manager," that "promise" was qualified by a requirement that he perform well. (*See* Am. Compl. at ¶ 65.)

[15] The court notes that Wright and Whitter allege that defendant discriminatorily denied them the opportunity to participate in entry-level management training based upon their race, and that defendant discriminatorily denied them promotion to entry-level management positions based upon their race. (*See* Am. Compl. at ¶¶ 23, 25, 26, 83; DX D at 346-47, 365-70, 373-74; DX E at 54-55, 62-63, 141-42, 145, 160, 184-85, 238, 258-63.)

21-22.)

In October 1994, Opie requested and received a voluntary demotion to Sales Counselor

and a transfer to the North Point store, which was a brand new store. (*Id.* at ¶ 70.) Opie was

never promoted and he eventually left Circuit City in March 1996. (*Id.* at ¶ 71; DX F at 268.)

Opie's personal knowledge of defendant's policy and practice is limited to the stores in which he

worked, except that on one occasion he spoke to a Circuit City employee from South Carolina

regarding their complaints of discriminatory treatment. (DX F at 267-70.)

**C.**    **Class Claims**

Plaintiffs request certification of the following class:

> All Black persons who were employed by Circuit City Stores, Inc. in any of its
> Southern Division stores, warehouses, or service centers at any time between
> November 21, 1991 and the present, and who expressed an interest in advancing
> into management positions but who were discriminated against on the basis of
> race and were denied or otherwise deprived of the same opportunities to advance
> as were given to equally or less qualified white employees.

(Motion for Class Certification ("Pls.' Mot.") at 1; Pls.' Br. at 1.) In their Complaint, plaintiffs

contend:

> The under-representation of Black employees in the sales manager, store
> manager, district manager, general manager, and other upper-level management
> positions throughout the company directly stems from Circuit City's pattern and
> practice or policy of discriminating against Black people with regard to
> promotions, assignments, training, transfers, and other terms and conditions of
> employment. . . . Circuit City has pursued a policy or pattern and practice of
> denying Black employees equal opportunities for advancement and career
> development and other benefits of employment on a continuing basis for years.
> Such policies, practices, and patterns include, but are not limited to:
>
>> a.    failing or refusing to implement uniform procedures to ensure that
>>       all employees have equal notice of departmental, store-wide,
>>       district-wide, regional, divisional, and higher-level job openings
>>       and promotional opportunities, thereby adversely and unfairly
>>       affecting the ability of Black employees to be promoted and to

advance within the company;

b.    failing or refusing to establish an objective and uniform set of criteria under which Black and white candidates and other employees who express an interest in or apply for promotions, management training, or management positions can be evaluated and selected;

c.    engaging in a subjective decision-making process with regard to decisions about transfers, promotions, training programs, on-the-job training, assignments, discipline, employee evaluations, compensation, and other terms and conditions of employment;

d.    relying upon a subjective and largely discretionary assessment of the relative qualifications of the Black and white candidates and prospective applicants for supervisory and managerial jobs that is conducted by a non-diverse supervisory and managerial workforce;

e.    requiring Black applicants for managerial posts to satisfy job qualification requirements that whites do not have to satisfy in order to be selected, with the intention and effect of excluding qualified Black candidates because of their race;

f.    maintaining more onerous performance standards for Black employees than for similarly situated white employees;

g.    assigning African-American and other Black employees to less desirable, lower-paying positions and departments within Circuit City's stores;

h.    assigning African-American sales managers and store managers to stores that are located in economically disadvantaged neighborhoods or other undesirable neighborhoods and/or shopping centers where the profit margin is disproportionately low;

i.    failing or refusing to consider Black employees for promotions to management or for management training opportunities or for employment in management positions on the same basis as white applicants and employees are considered for such things;

j.    failing or refusing to provide Black employees with the necessary work experience, training, support, encouragement, or other assistance that would enable them to qualify and compete for

10

higher-paying, more desirable jobs within the company on the same basis as whites;

k.   paying Black employees less than comparably situated whites, or granting them less opportunity to earn equal commissions as comparably situated white employees;

l.   engaging in a pervasive and blatant pattern and practice of discrimination with the goal of deterring or discouraging Black employees from seeking promotions, training opportunities, and other forms of advancement into management or policy-making roles within Circuit City;

m.   engaging in a pervasive and blatant effort to frustrate or discourage Black employees who do seek promotions to or employment in management positions or who request the opportunity to participate in management training courses with the intent or effect of causing them to cease their efforts or to leave the company's employ;

n.   Failing or refusing to take all necessary steps to eradicate the continuing policies or patterns and practices of racial discrimination and the continuing effects of such policies, patterns or practices in Circuit City's operations around the country; and

o.   denying Black employees of Circuit City the right to receive the same terms, conditions, privileges, and immunities of employment with the company that Circuit City accords to white employees.

(Am. Compl. at ¶¶ 19-20.)

Defendants contend that plaintiffs' proposed class should not be certified because: (1) the class is not narrow in its geographic scope because the class covers fifteen states, 160 stores, and numerous warehouses and service center facilities, but plaintiffs have only worked in four stores in three states, (Opposition of Defendant Circuit City Stores, Inc. to Plaintiffs' Motion for Class Certification ("Def.'s Br.") at 1); (2) the class is not narrow in its temporal scope because it covers a ten-year period, but plaintiffs' employment histories touch only a portion of this period, (*id.* at 2); (3) the class is not narrow in the scope of its issues because plaintiffs are challenging

11

"most employment practices from the moment of hire to the moment of termination, including

[(a)] store assignment, [(b)] department assignment, [(c)] training for current and future jobs,

[(d)] identification of promotion candidates, and [(e)] selection of promotion candidates," (*id.*);

(4) "the facts pertaining to Plaintiffs' own claims are internally inconsistent and belie any

adverse patterns or practices," (*id.* at 2); (5) although plaintiffs assert that the class is numerous,

they omitted four key considerations: (a) they failed to offer sworn testimony, (b) they failed to

remove the employees who are bound by the AIRP from the proposed class, (c) they failed to

focus on the residual group that was interested in entry-level promotion, and (d) they ignored the

issue of practicable joinder, (*id.* at 3); (6) the proposed representatives are too disparate in that

they did not share common stores, managers, or comparators, they lack personal knowledge

regarding stores in which they did not work, and they raise entirely different concerns within

their respective stores, (*id.*); (7) they ignored the applicable statutes of limitations period for

§ 1981 claims, and plaintiffs' "allegations are concentrated in an extremely narrow band of time

that cannot justify class consideration," (*id.* at 3-4); (8) plaintiffs do not qualify as adequate class

representatives because (a) none of the proposed representatives have worked at Circuit City for

a number of years, (b) Wright recently plead guilty to possession of a forged instrument, and (c)

their withdrawal of their claims for compensatory and punitive damages is a shell game, (*id.* at

4); (9) plaintiffs' counsel do not qualify as adequate representatives because they are motivated

by a hefty fee, (*id.* at 4-5);[16] and (10) plaintiffs have failed to present any evidence from which to

_____

[16] Specifically, defendant argues, "the elimination of the damage claims solves nothing – it leaves members of the purported class with an injunctive action lead by Plaintiffs with no stake in such relief and individual damage actions if they believe they have the proof to proceed. This case, therefore, does not safeguard the interests of anyone but the Plaintiffs and their counsel. It is harsh to assert that fees are a motivation for this certification motion, but the conclusion

infer the existence of a pattern and practice of race discrimination because: (a) "[t]here is no deluge of declarations from similarly situated employees or former employees," (b) "Plaintiffs have informed the Court that they have not succeeded in locating any other potential class representatives;" (c) there has been "no effort to quantify the members of the class or to indicate how they can speak for absentees across approximately one third of the states in the country as to a[n] inconsistent mix of allegations," and (d) there are no statistics despite the fact that plaintiffs "have had thousands of computerized records and personnel transactions for more than two years." (*id.* at 5).

## II.  DISCUSSION

### A.    <u>Overview of the Applicable Law</u>

#### 1.    *Class Certification*

Class actions serve three principal functions: (1) facilitating judicial economy by the avoidance of multiple suits on the same subject matter; (2) providing a feasible means for asserting the rights of those who "would have no realistic day in court if a class action were not available;" and (3) deterring inconsistent results and assuring a uniform, singular determination of rights and liabilities. *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 345-46 (S.D. Ga. 1996) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 550 (1974) and *First Federal of Michigan v. Barrow*, 878 F.2d 912, 919 (6th Cir. 1989)).

The question of class certification is a procedural one, distinct from the merits of the action. *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir. 1980).  In determining whether to certify a

_____

appears obvious."  (Def.'s Br. at 4-5.)

class, a court may consider both the allegations of the complaint and the supplemental evidentiary submissions of the parties. *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976). Further, although a district court is not to determine the merits of a case at the certification stage, sometimes "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 n.11 (11th Cir. 1992) (quoting *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160 (1982)).

"A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ.P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). Further, a class action may only be certified if the court is satisfied, after a "rigorous analysis," that the prerequisites of Federal Rule of Civil Procedure 23 have been satisfied. *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984). Thus, the court must evaluate whether the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy of representation. *See* FED. R. CIV. P. 23(a). Furthermore, the court must determine whether one of the following grounds for maintaining the suit as a class action pursuant to Rule 23(b) is present: (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* FED R. CIV. P. 23(b). The party seeking to maintain the class action bears the burden of demonstrating that all of the prerequisites for class certification have been satisfied. *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1363 (11th Cir. 1984).

2.    *Section 1981*

Plaintiffs seek class certification of their § 1981 claims.  Section 1981 provides that all

citizens shall have the same right to "make and enforce contracts."  42 U.S.C. § 1981.  "The aim

of the statute is to remove the impediment of discrimination from a minority citizen's ability to

participate fully and equally in the marketplace."  *Brown v. American Honda Motor Co.*, 939

F.2d 946, 949 (11th Cir. 1991).  Section 1981 requires proof of *intentional* discrimination.  *Id.*

(citing *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391 (1982).

The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is

the same as the formulation used in Title VII discriminatory treatment causes.  *Id.* at 949 (citing

*Patterson v. McLean Credit Union*, 491 U.S. 164, 185-87 (1989)).[17]

Plaintiffs claims are based on both disparate impact and disparate treatment.  (*See* Pls.'

Reply at 8-9.)  Disparate impact claims "involve employment practices that are facially neutral

in their treatment of different groups but that in fact fall more harshly on one group than another

and cannot be justified by business necessity. . . . Proof of discriminatory motive . . . is not

required under a disparate impact theory."  *International Brotherhood of Teamsters v. United*

*States*, 431 U.S. 324, 335-36, n.15 (1977).  In a disparate impact case, the plaintiff must

demonstrate that a challenged employment action or practice has a disproportionate adverse

impact on a category of persons protected by the statute.  *See Fitzpatrick v. City of Atlanta*, 2

F.3d 1112, 1117 (11th Cir. 1993).  Further, "[a] plaintiff must identify a specific employment

practice that leads to the disparate impact."  *Edwards v. Wallace Community College*, 49 F.3d

---

[17]  However, the filing of a Title VII charge and resort to Title VII's administrative
machinery are not prerequisites for the institution of a § 1981 action.  *Johnson v. Railway*
*Express Agency, Inc.*, 421 U.S. 454, 460-61 (1975).

1517, 1520 (11th Cir. 1995). "Once such a prima facie case has been made out, the defendant

must show that the challenged action is demonstrably necessary to meeting a goal of a sort that,

as a matter of law, qualifies as an important business goal" or a legitimate, non-discriminatory

business objective. *Fitzpatrick,* 2 F.3d at 1117; *see also EEOC v. Joe's Stone Crab, Inc.,* 220

F.3d 1263, 1275 (11th Cir. 2000). The plaintiff bears the initial burden of demonstrating a

disparate impact, and the burden then shifts to the employer to demonstrate that the otherwise

neutral policy was justified by business necessity. *See Fitzpatrick,* 2 F.3d at 1117-18. However,

even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an

alternative, non-discriminatory practice would have served the defendant's stated objective

equally as well. *Joe's Stone Crab,* 220 F.3d at 1275.

      In a disparate treatment case, by contrast, an employer treats an individual less favorably

than others because of his or her race. *Teamsters,* 431 U.S. At 324 n.15. In any action alleging

disparate treatment by an employer, the plaintiff must prove that the employer acted with a

discriminatory motive. *See id.* To establish a prima facie case of discrimination, a plaintiff may

employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination,

or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th

Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending

upon whether the plaintiff's proof is direct or circumstantial in nature. In a disparate treatment

case relying on circumstantial evidence, the employee initially bears the burden of establishing a

prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450

U.S. 248, 252-53 (1981). The employee achieves this by demonstrating that he applied for a job

or promotion for which he was qualified, and was rejected "under circumstances which give rise

to an inference of unlawful discrimination." *Id.* If successful, the presumption is that the

employer discriminated against the employee. *Id.* at 254. The employer must then rebut this

presumption by proffering a legitimate, nondiscriminatory reason for the employment decision.

*Id.* at 254-55. The reason must be sufficient to raise a "genuine issue of fact." *Id.* at 254. The

employee then bears the ultimate burden of persuasion. *Id.* at 256.

## B.      Rule 23(a) Requirements

Before a class can be certified through one of the provisions of Rule 23(b), it must first

meet the four requirements enumerated in Federal Rule of Civil Procedure 23(a). This Rule

provides:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly and adequately
> protect the interests of the class.

FED. R. CIV. P. 23(a).[18] "Rule 23(a) acts as a lens through which the court looks to ensure that

---

[18] The Eleventh Circuit recently stated that "[i]n many ways, the commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000) (citations omitted). Distinguishing these requirements from one another, however, the *Prado-Steiman* court explained that "[t]raditionally, commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class," but that "[n]either of these requirements requires that 'all putative class members share identical claims.'" *Id.* at 1279 & n.14 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994)). Commonality and typicality "may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class at large." *Id.* (citations omitted). The named representatives' claims must "share 'the *same essential characteristics* as the claims of the class at large,'" as "'a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences.'" *Id.* (quoting *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (internal quotation marks and citation omitted)).

17

the interests and claims of the representative plaintiff match those of the putative class." *Buford,*

168 F.R.D. at 347 (citing *Falcon,* 457 U.S. at 156) and *General Telephone Co. of Northwest v.*

*EEOC,* 446 U.S. 318, 330 (1980)). Thus,"a class representative must be part of the class and

'possess the same interest and suffer the same injury' as the class members." *East Texas Motor*

*Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists*

*Committee to Stop the War,* 418 U.S. 208, 216 (1974)). In essence, these requirements ensure

that each putative class member's right of access to the courts is being asserted through a

representative having similar goals and interests. *Buford,* 168 F.R.D. at 348.

      Plaintiffs, as class representatives, bear the burden of proving that all four prerequisites

of Rule 23(a) are met. *Id.* Failure to establish any one requirement will completely defeat a

motion for class certification. *Id.* Under the decision of the United States Supreme Court in

*Falcon,* the court must undertake a "rigorous analysis" to ensure that the Rule 23(a)

requirements have been met. *Falcon,* 457 U.S. at 161.[19] In *Falcon,* the Supreme Court stated:

---

[19] In *Falcon,* the Supreme Court held that a Title VII plaintiff, who alleged that he had been discriminatorily denied a promotion, could not maintain a class action on behalf of both employees who were denied promotions and applicants who were denied employment. *Falcon,* 457 U.S. at 147. In *Falcon,* the named plaintiff was a Mexican American whose only personal claim was for an allegedly discriminatory denial of a promotion. *Id.* at 148-51. On the class claims, the plaintiff sought to bring a broad-based challenge to a wide variety of allegedly discriminatory employment practices. *Id.* at 151-52. The district court certified a class of all hourly Mexican American employees and applicants for employment, relying on the Fifth Circuit's "across the board" doctrine, under which "any victim of racial discrimination in employment may maintain an 'across the board' attack on all unequal employment practices alleged to have been committed by the employer pursuant to a policy of racial discrimination." *Id.* at 152. The Fifth Circuit affirmed the district court. *Id.* at 153-54.

    The Supreme Court expressed agreement with the "proposition underlying the across-the-board rule--that racial discrimination is by definition class discrimination." *Id.* at 157. However, the Court further stated that "the allegation that such discrimination occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that can be certified." *Id.* at 157. After analyzing the named plaintiff's class claims under Rule

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim.

*Falcon*, 457 U.S. at 157-58. The Court further stated, "[b]oth [typicality and commonality] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 157 n.13. Thus, the Supreme Court made it clear that "allegation[s] that [racial] discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." *Id.* at 157. In the cases decided since *Falcon*, "the courts have made it clear that in cases alleging classwide

───────────────

23(a), the Court concluded that the district court erred in certifying the class on the presumption that the plaintiff's claim was typical of the class claims. In particular, the Court noted that the plaintiff failed to satisfy the typicality and commonality requirements of Rule 23(a), since "[h]e attempted to sustain his individual claim by proving intentional discrimination" while trying to "prove the class claims through statistical evidence of disparate impact." *Id.* at 159. The Court emphasized that a "Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161.

However, in footnote fifteen of *Falcon*, the Supreme Court identified exceptions to the general rule. For example, an employee who alleges that he was a victim of a specific discriminatory employment practice may properly represent applicants when the employer used a biased testing procedure to evaluate both applicants and incumbent employees: "a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." *Id.* at 159 n.15. In addition, a general policy of discrimination could justify a class of both applicants and employees "if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.*

[discrimination] in particular employment actions, plaintiffs must show a company-wide policy or practice, beyond individualized claims of discrimination." *Abrams v. Kelsey-Seybold Medical Group, Inc.,* 178 F.R.D. 116,  129 (S.D. Tex. 1997) (collecting cases).  Further, the Eleventh Circuit has interpreted *Falcon* strictly and generally has not permitted broad class actions alleging employment discrimination, absent evidence that an employer acted in a similar manner toward all members of the particular group.  *See, e.g., Washington.*, 959 F.2d at 1569-70; *Griffin v. Dugger*, 823 F.2d 1476, 1486-87, 1491-92 (11th Cir. 1987); *Walker*, 747 F.2d at 1363-65; *Gilchrist*, 733 F.2d at 1555; *Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 618 (11th Cir. 1983), *cert. denied*, 465 U.S. 1066 (1984).  In fact, the Eleventh Circuit has stated:

> The situations the Supreme Court identified in footnote fifteen can be thought of as exceptions to the general rule that applicants and incumbent employees cannot share the same class.  We emphasize, however, that those situations are exceptions not because racial discrimination is by definition class discrimination, a necessarily valid proposition underlying the across-the-board rule, . . . but because the commonality and typicality requirements of Rule 23(a) can be satisfied.  If, after a rigorous analysis, a district court is satisfied that in a case similar to those situations described in footnote fifteen the Rule 23(a) requirements have been met, then it should not hesitate to certify the class.  We caution, however, that although district courts should give real meaning to *Falcon's* footnote fifteen, that footnote should not be used to defeat the general dictates of *Falcon*. The footnote was not meant to sanction broad class actions that otherwise do not conform to Rule 23(a).

*Griffin*, 823 F.2d at 1487.

### 1.   *Numerosity*

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable.  The Eleventh Circuit has stated:

> Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class. . . . Furthermore, the relevance of the numerosity requirement to class certification may in appropriate cases be less significant where in fact class wide

> discrimination has been alleged. . . . Finally, at least one court has recognized that where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1).

*Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (citations omitted). "Practicability of joinder depends on many factors, including for example, the size of the class, ease of identifying its numbers and determining their addresses, [and] facility of making service on them if joined and their geographic dispersion." *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

Rule 23(a)(1) incorporates no bright-line test for determining numerosity. *Buford*, 168 F.R.D. at 348. This determination rests on the court's practical judgment in light of the particular facts of the case. *See Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 371 (D. Del. 1990). The class representative is not required to establish the exact number in the proposed class. *Evans*, 696 F.2d at 930; *Tolbert v. Western Elec. Co.*, 56 F.R.D. 108, 113 (N.D. Ga. 1972). "Plaintiffs must show some evidence of or reasonably estimate the number of class members." *Hively v. Northlake Foods, Inc.,* 191 F.R.D. 661, 666 (M.D. Fla. 2000) (citing *Barlow v. Marion County Hospital Dist.*, 88 F.R.D. 619, 625 (M.D. Fla. 1980)). Estimates as to the size of the proposed class are sufficient for a class action to proceed. *Id.* (citing *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321, 324 (E.D. N.Y. 1982)). Mere speculation and unsubstantiated allegations as to numerosity, however, are insufficient to satisfy Rule 23(a)(1). *See Hewlett v. Premier Salons International, Inc.,* 185 F.R.D. 211, 215 (D. Md. 1997); *Tolbert,* 56 F.R.D. at 113.

21

Plaintiffs assert:

> The putative class in the case at bar number at least several hundred.  Joinder is impossible, not only because of the size of the class, but also because of its geographical dispersion.  The plaintiffs propose to represent all Black employees of Circuit City who worked in any of the company's stores and warehouses throughout the Southern Region at any time from November 21, 1991 through the present.  The Southern Region has changed in composition slightly over the years, but has always included the states of Alabama, Georgia, North Carolina, South Carolina, Florida, Tennessee, Texas, and Oklahoma. . . . During part of the time covered by this lawsuit, the Southern Region has included Kansas, Missouri, Nebraska, and Arkansas. . . . The plaintiffs expect to prove that Black employees in all of the Southern Region's stores were subjected to the same or similar treatment as the proposed class representatives were, thus easily meeting the numerosity standard of Rule 23(a).

(Pls.' Br. at 6-7.)  Plaintiffs further assert that "[c]ontrary to defendant's assertions, plaintiffs need only provide a reasonable estimate of the number of class members to satisfy the numerosity requirement," and "[g]iven the fact that there is no requirement that each class member be identifiable . . . or that each class member have been discriminated against personally, . . . the determination of numerosity must be made based on the total number of Black employees in the Southern Division during the relevant time frame."  (Plaintiffs' Brief in Reply to Defendant's Brief in Opposition to Class Certification ("Pls.' Reply") at 4.)

Defendants assert that plaintiffs do not meet the numerosity requirement because (1) "they have failed to cull from their proposed class the employees who are subject to the Circuit City arbitration program," (2) "Plaintiffs have presented absolutely no evidence [regarding] how many Black employees were both outside the arbitration program and interested in advancement," and (3) "even if Plaintiffs showed how many Black employees were outside the arbitration program and interested in advancement, they have presented no information whatsoever on their location within the 15 states that comprise the Southern Division and

22

whether the Court could reasonably join them in a single action." (Def.'s Br. at 32-33.)

Plaintiffs contend that the class would include "at least several hundred" black employees, (*see* Pls.' Br. at 6), and that "the number of Black employees of Circuit City stores in the Southern Region during the proposed class period (or even during any given year within that period) was substantially in excess of 500," (Pls.' Br. at 11). As noted above, plaintiffs "propose to represent all Black employees of Circuit City who worked in any of the company's stores and warehouses throughout the Southern Region at any time from November 21, 1991 through the present." (*Id.*) The evidence shows that, just during 1996, defendant had approximately 7,000 to 8,500 employees in the Southern Region. (PX 7 at 58, 72.) Even acknowledging that the employees subject to the arbitration agreement would not be able to participate in the lawsuit as class members, there is nothing to suggest that their elimination from the pool of current and former black employees who are not subject to the arbitration agreement would reduce the total number of class members to a level too low to satisfy the numerosity requirement. *See, e.g., Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) ("[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.") (internal quotations omitted); *Zeidman v. J. Ray McDermott Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) ("[N]o definitive pattern has emerged under Rule 23(a) (1) in terms of the number of purported class members. Indeed, classes with as few as twenty-five or thirty members have been certified by some courts."). Although plaintiffs have presented no evidence regarding the exact number of the black employees employed by defendant, the court concludes that the class would be so numerous as to make joinder impracticable. Because "a plaintiff need not show the precise

23

number of members in the class," "the relevance of the numerosity requirement to class

certification may in appropriate cases be less significant where in fact class wide discrimination

has been alleged," and "where the numerosity question is a close one, a balance should be struck

in favor of a finding of numerosity," *Evans*, 696 F.2d at 930, the court is of the opinion that the

numerosity requirement has been met in this case.[20]

### 2.    *Common Questions of Law or Fact*

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  Rule

23(a)'s "commonality" provision does not require complete identity of legal claims.  *Johnson v.*

*American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978) (citing 7 C. Wright & A.

Miller, Federal Practice and Procedure: Civil § 1763 (1972)).  "[M]inor differences in the

underlying facts of individual class members' cases do not defeat a showing of commonality

where there are common questions of law." *Luyando v. Bowen*, 124 F.R.D. 54, 55 (S.D. N.Y.

1989).  Further, the movant need not show, at this stage, that the common question overwhelms

the individual questions of law or fact which may be present within the class.  *Buford*, 168

F.R.D. at 349 (citing *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600

(S.D. N.Y. 1989) and *Ashe v. Board of Elections in the City of New York*, 124 F.R.D. 45, 48-49

(E.D. N.Y. 1989)).  However, "if broad discrimination is the *only* common denominator in the

class, this does not satisfy the commonality requirement." *Zachery v. Texaco Exploration and*

*Production, Inc.*, 185 F.R.D. 230, 238 (W.D. Tex. 1999) (citing  *Wheeler v. City of Columbus,*

---

[20] Defendant argues that plaintiffs' determination of the number of members in the
putative class is based on mere speculation and unsubstantiated allegations.  The court was
initially of the opinion that plaintiffs had failed in establishing the required numerosity.  While
the question is close, the court has determined that the numerosity requirement has been met.

*Mississippi*, 703 F.2d 853, 855 (5th Cir. 1983)).

The prosecution of disparate treatment claims, "while not dispositive, weighs against finding the commonality and typicality required by Rule 23." *Washington*, 959 F.2d at 1570 n.10. The "locus of decisionmaking authority is an important consideration when determining whether class certification is appropriate for systemic discrimination claims involving multiple facilities." *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 655 (M.D. Ala. 1999) (citing 2 Barbara Lindemann & Paul Grossman, Employment Discrimination Law, 1598 ("Even [in disparate treatment cases] evidence of centralized policy or decisionmaking can support certification of classes encompassing geographically separate facilities or different business units.") (footnotes omitted); 5 Newberg on Class Actions, § 24.21 ("[A]n absence of supported allegations by the plaintiff of centralized employment decisionmaking or a showing of decentralization by the defendant may result in a denial or reversal of class certification.")). At the certification stage, the court must be able to infer that the class members suffered from a common policy of discrimination that "'pervaded the challenged employment decisions.'" *Shores v. Publix Super Markets, Inc.*, No. 95-1162-CIV-T-25(E), 1996 WL 407850, at *3 (M.D. Fla. 1996) (quoting *Hartman v. Duffy*, 19 F.3d 1459, 1472 (D.C. Cir. 1994)). Because disparate treatment claims are by their very nature individual, the class treatment of these claims requires close scrutiny of the proposed class and their claims. *Zachery,* 185 F.R.D. at 239 (citing *Abrams,* 178 F.R.D. at 129).

However, in a disparate impact claim where plaintiffs claim practices that are facially neutral in their treatment of different groups, the commonality requirement may be more easily met than in a disparate treatment case. *See Brooks v. Circuit City Stores Inc.*, 1996 WL 406684, *3 (D. Md. 1996). "Disparate impact cases typically involve readily identified, objectively

applied employment practices such as testing procedures.  The common reach of such practices

is likely to be clearer and easier to establish than a general policy of race discrimination alleged

to unite otherwise factually dissimilar disparate treatment claims." *Washington*, 959 F.2d at

1570 n.10 (citing *Nelson v. United States Steel Corp.*, 709 F.2d 675, 679 n.9 (11th Cir. 1983)).

Nonetheless, to satisfy the commonality requirement, plaintiffs must show a discriminatory

policy or procedure of general application to the class they seek to certify.  *See, e.g., Abrams,*

178 F.R.D. at 132-33.

> Plaintiffs contend:

> In the case at bar, there are several questions of law or fact common to the
> proposed class.  The plaintiffs have alleged that Circuit City operates a system
> that relies on subjective decision-making in terms of selecting who will be sent to
> management training courses and thus who will be promoted.  Prior to 1994,
> Circuit City Store Managers would simply hand-pick the sales or customer
> service associates whom they wanted to send for management development
> training. . . . There did not even appear to be any pretense of objective selection
> procedures. . . . The plaintiffs contend, among other things, that the process of
> selecting participants for the training programs has never been fair or objective,
> and that Circuit City manipulates the criteria for selecting trainees in order to
> ensure that few Black employees enter the management ranks.

(Pl.'s Br. at 12-13.)  Further, plaintiffs assert that because they are "challenging the use of . . .

common discriminatory components *per se*, and not merely the individualized manifestations of

their use, the fact that the components were applied by different people at different levels of the

defendant's organization is of no consequence." (*Id.* at 15-16.)  Defendant asserts that there are

no common questions of law or fact[21] because the class definition is defective beyond repair in

geographic scope, temporal scope, and issue scope, (Def.'s Br. at 33-36), and plaintiffs' claims

---

[21]  Because the commonality and typicality requirements tend to merge, defendant
combined its arguments as to these requirements under one heading.

are not only "individualistic," but they are also "inconsistent with one another," (*Id.* at 36).

As discussed above, "[a]lthough discrimination is by its very nature a class claim, allegations of across the board discrimination do not by themselves meet the requirements of Rule 23." *Zachery,* 185 F.R.D. at 239 (citing *Bostron v. Apfel,* 182 F.R.D. 188, 192-94 (D. Md. 1998)). In this case, the purported class is spread across as many as fifteen states involving 125 to 160 different stores, warehouses, and service center facilities, each of which has had varying degrees of autonomy over hiring, evaluation, assignment, training, and promotion decisions. By plaintiffs' own Complaint, (*see* Am. Compl. at ¶¶ 19, 20, 21), these decisions were made by various levels of management and were based upon subjective criteria.[22]

---

[22] As previously noted, plaintiffs assert their claims under theories of both disparate impact and disparate treatment; however, at oral argument, plaintiffs' counsel indicated that plaintiffs are relying more heavily on the disparate treatment theory. Plaintiffs further noted at oral argument that the employment decisions at issue were based on a selection system that combines both objective and subjective criteria, but argued that there is a "serious problem with a couple of the so-called objective criteria because they themselves can be manipulated by white managers."

As to any claims under a disparate impact theory, where "there are objective factors, even a generally subjective process will not satisfy the typicality and commonality requirements." *Abrams,* 178 F.R.D. at 132 (collecting cases). Further, "[t]he decision to permit some consideration of subjective factors is not, in and of itself, a discriminatory practice that provides the unifying thread necessary for 'commonality' to exist." *Abram,* 200 F.R.D. at 430; *see also EEOC v. McDonnell,* 17 F. Supp. 2d 1048, 1052 (E.D. Mo. 1998) ("[A] decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a systematic, company-wide policy of intentional discrimination."), *aff'd,* 191 F.3d 948 (8th Cir. 1999); *De La Fuente v. Chicago Tribune Co.,* No. 84 C 4596, 1985 WL 2103, at *4 (N.D. Ill. July 24, 1985) (plaintiff must prove more than existence of a "subjective procedure;" he must establish that the procedure discriminates against "a significant number of people"). "If the decision to permit some measure of subjectivity could be regarded as itself a discriminatory practice, virtually all [discrimination] cases against large employers would be transformed into nationwide class action lawsuits." *Abram v. United Parcel service of America, Inc.,* 200 F.R.D. 424, 430 (E.D. Wis. 2001). "The class action device was never intended to have such broad application. Rather, it was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Id.* (citing *Califano v. Yamaski,* 442 U.S. 682,

After careful consideration of the plaintiffs' allegations and the evidence submitted by the parties, the court can find no identifiable pattern or practice that affects a definable class in common ways. Rather, the court is of the opinion that the purported class is comprised of a large group of diverse and differently situated employees whose highly individualized claims of discrimination do not lend themselves to class-wide proof. In addressing plaintiffs' disparate impact claim, the court agrees with the reasoning and analysis of the court in *Lott v. Westinghouse Savannah River Co., Inc.*, 200 F.R.D. 539, 553-54 (D. S.C. 2000):

> Plaintiffs have attempted to show that various evaluation policies, salary policies, training policies and the like have had a disparate impact on African Americans because African Americans do not fare statistically as well as others under those policies. The situation prevailing in a bona fide disparate impact case in which an employment test or policy, neutral on its face and applicable to all employees, impacts adversely on the protected class is not present here. Another element figures prominently: the intervening conscious decisions of a multitude of diverse managers and supervisors. It is the participation and conscious expression of choice by those managers and supervisors which renders this case distinguishable from the classic disparate impact case. . . . [As the court noted] *in Brooks v. Circuit City Stores, Inc.*, 1996 WL 406684 (D. Md. 1996) (unreported), *reversed in part on other grounds*, 148 F.3d 373 (4th Cir. 1998), . . . "Notwithstanding an isolated conclusory allegation of disparate impact, the gravamen of the complaint is one of disparate treatment. Plaintiffs purport to attack a particular policy or procedure at Circuit City that results in class wide discrimination -- subjective decisionmaking. However, Plaintiffs do not and cannot allege that subjective decisionmaking itself is a practice that discriminates. Rather, they can only allege that it allows a situation to exist in which several different managers are able to discriminate intentionally. The focus of the claim remains the individual employment decisions."

Although the court notes that plaintiffs share the common position of being black employees employed by defendant,[23] their allegations are distinct and individualized. Plaintiffs were

700-01 (1979)).

[23] However, the court notes that plaintiffs are former employees of defendant, but are seeking to represent a class composed of both former and current Circuit City employees.

28

employed in different stores, in different states, in different departments, and at different levels within the company hierarchy.  Their claims are not susceptible to generalized proof or defenses. For example, Wright claims that defendant discriminatorily denied him a transfer to Audio and Video departments based on his race, (*see* DX D at 60-62); yet, Opie worked in these departments as a Sales Counselor, (DX F at 19, 21).  Wright and Whitter allege that defendant discriminatorily denied them the opportunity to participate in entry-level management training based upon their race, and that defendant discriminatorily denied them promotion to entry-level management positions based upon their race, (*see* Am. Compl. at ¶¶ 23, 25, 26, 83; DX D at 346-47, 365-70, 373-74; DX E at 54-55, 62-63, 141-42, 145, 160, 184-85, 238, 258-63), but defendant sent Opie to entry-level management training and promoted him to entry-level management as a Sales Manager. (DX F at 21-22.)  Further, Whitter and Wright sought promotion to entry-level management, but to entirely different store hierarchies: Whitter sought promotion to Sales Manager and Wright sought promotion to Operations Manager. (*See* Am. Compl. at ¶¶ 23, 25, 26, 83; DX D at 346-47, 369-70; DX E at 62-63, 90, 184-85, 258.)[24]

Certification of a class of employees asserting disparate treatment claims is likewise untenable.  Based on the set of facts set forth at the beginning of this Memorandum Opinion, plaintiffs ask the court to certify a class of all Blacks who sought and were denied management training, promotion into management positions, or transfer to different positions or stores, in every store, warehouse, and service center in the Southern Division. (*See* Pls.' Br. at 1, 2; Pls.'

---

[24]  As noted above, each store maintains a management hierarchy. (DX A at ¶ 8.)  The sales ladder moves from Sales Counselor, a 100% commissioned work force, to Sales Manager, and then to Store Manager. (*Id.* at ¶ 9.)  The operations ladder moves from Customer Service Representative, a 100% hourly paid work force, to Customer Service Manager, and then to Operations Manager. (*Id.* at ¶ 10.)

Reply at 3.)[25]  Further, plaintiffs seek to include within the scope of their class such fact-specific issues as individual training, individual performance evaluation, and individual interest in promotion.  Plaintiffs seek to represent individuals who worked in a multi-state geographical area, in different organizational divisions of the defendant, in separate facilities, at different times, reporting directly to and under the direct supervision of numerous autonomous decision-makers.  Thus, Plaintiffs claims do not lend themselves to class treatment.  Further, it is foreseeable that defendant would raise specific evidence as to each proposed class representative as to why he or she was not promoted, transferred, or better trained.  Delving into the business practices of each store, warehouse, or service center facility and conceivably into the individual decisions is precisely the type of individualized inquiry that class actions were designed to avoid. *See, e.g., Abram,* 200 F.R.D. at 433 ("[T]he Court can find no identifiable discriminatory pattern or practice that affects a definable class in common ways. . . . Instead, the Court is left with the impression of a large group of diverse (and diversely-treated) supervisors whose highly individualized claims of discrimination do not lend themselves to class-wide proof.") (citations and quotations omitted); *Zachery,* 185 F.R.D. at 239-40 (finding that plaintiffs had not met the commonality requirement where the action "would degenerate into multiple individual determinations for each individual proposed class representative"); *Abrams,* 178 F.R.D. at 130 (finding that plaintiffs failed to meet the commonality requirement because "[r]esolution of the merits of the claims [would] require independent consideration of each plaintiff's qualifications for the positions sought, as well as the qualifications and work history of those nonminority

---

[25]  The court notes that one of the named representatives actually received management training and was promoted to Sales Manager.  (*See* DX F at 21-22.)

30

employees hired when African-American applicants were rejected); *Lumpkin v. E.I DuPont De Nemours & Co.,* 161 F.R.D. 480, 482 (M.D. Ga. 1995) ("Although Plaintiffs share the common position of being present employees of [defendant], their allegations are discrete and individualized.  They are employed in different departments, supervised by different people, work different shifts and are at different levels within the company hierarchy.  Their grievances are not susceptible to generalized proof or defenses.").

Thus, following *Falcon* and its progeny, the court concludes that plaintiffs' Complaint and the evidence offered in support of plaintiff's Motion for Class Certification, provides an insufficient basis for concluding that the adjudication of plaintiffs' claims would require the resolution of common questions of law or fact concerning defendant's discriminatory practices in training, job assignment, transfer, and promotion.  Plaintiffs disparate treatment allegations, as well as their disparate impact arguments, do not overcome the essentially individualized nature of the claims they assert.

### 3.    *Typicality of claims*

Some courts consider the typicality requirement of Rule 23(a)(3) to be a redundant criterion and have expressed doubt as to its utility.  *See, e.g., Sanders v. Robinson Humphrey/American Express, Inc.*, 634 F.Supp. 1048, 1056 n.10 (N.D. Ga. 1986); *Buford,* 168 F.R.D. at 350; *Faulk,* 184 F.R.D. at 655.  "While some courts consider typicality synonymous with the commonality requirement, other courts equate typicality with adequacy of representation." *Buford,* 168 F.R.D. at 350 (citing *Alfus v. Pyramid Technology Corp., 764 F.Supp. 598, 606 (N.D. Cal. 1991)).  Typicality is satisfied where the claims of the class representatives arise from the same broad course of conduct of the other class members and are

31

based on the same legal theory. *Hively,* 191 F.R.D. at 667 (citing *Appleyard*, 754 F.2d at 958

(disapproved of on different grounds) (typicality requirement met where named plaintiffs' claims

have same essential characteristics as claims of class even if there are factual distinctions among

the claims of the plaintiffs of the class)); *Powers v. Stuart-James Co.*, 707 F.Supp. 499, 503

(M.D. Fla. 1989) ("The reasoning behind this requirement is that where all interests are

sufficiently parallel, all interests will enjoy vigorous and full presentation."). Essentially, the

class representative's claim is typical of the claims of the class if his claim and those of the class

"arise from the same event or pattern or practice and are based on the same legal theory."

*Kornberg,* 741 F.2d at 1337; *see also Sanders*, 634 F.Supp. at 1056. "The requirement is that

Plaintiff and each member of the represented group have an interest in prevailing on similar legal

claims. Assuming such interest, particular factual differences, differences in the amount of

damages claimed, or even the availability of certain defenses against a class representative may

not render his or her claims atypical." *Meyer v. Citizens and Southern Nat'l Bank*, 106 F.R.D.

356, 361 (M.D. Ga.1985) (citing *Zeffiro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D.

567, 569 (E.D. Pa. 1983)). However, "there must be a nexus between the class representative's

claims or defenses and the common questions of fact or law which unite the class." *Kornberg v.

Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004

(1985).

Plaintiffs contend that "[w]hether they proceed under a disparate treatment or a disparate

impact theory or both, however, it is clear that the plaintiffs will put on proof of a pattern and

practice of discrimination that extended to all stores within the Southern Region and that had the

same essential effect on other Black employees as it had on them. Their claims are thus typical

32

of those of the absent class members." (Pl.'s Br. at 17-18.)  More specifically, plaintiffs assert:

> [P]laintiffs unquestionably satisfy the typicality requirement . . . [because]
> [t]ypicality is established when the claims of the class plaintiffs and those of the
> putative class members arise from the same course of action or event and are
> based on the same legal or remedial theories. . . . There is no requirement that
> each plaintiff have precisely the same claims as each class member. . . . In this
> case, plaintiffs claim both disparate treatment and disparate impact theories of
> liability.  They allege that Circuit City's subjective decision-making process in
> sending skilled salespeople to management training and in promoting them to
> management positions is tainted by discrimination.  They allege that the vast
> majority of managers who make the final decision about whether to approve an
> employee's attendance at a training course are white, and that they
> disproportionately send white employees to receive the training.  They contend
> that the allegedly objective criteria that the managers consider in deciding who
> will attend the training courses can be and are manipulated by those same
> managers through assignments to certain stores or departments in which a
> salesperson's chances of meeting sales quotas month after month are slim.  They
> further contend that the criteria are applied differently to Black employees than to
> whites, with the result that whites are approved for management training more
> quickly and more readily than Blacks.

(Pl.'s Reply at 8-9.)  As noted above, defendants contend that plaintiffs fail to meet the

commonality and typicality requirements because the class definition is defective beyond repair

in geographic scope, temporal scope, and issue scope, (Def.'s Br. at 33-36), and plaintiffs'

claims are not only individualistic, but they are also inconsistent with one another, (*Id.* at 36).

The court agrees with defendant and concludes that plaintiffs have failed to meet the

typicality requirement regarding their disparate impact and disparate treatment discrimination

claims.  As with the commonality issue, it is foreseeable that defendant would raise specific

evidence pertaining only to each proposed class member as to why he or she was not promoted,

transferred, or better trained.  These reasons will be, by their very nature, individually tailored

and thus not "typical" for all class members.  Further, plaintiffs have presented no evidence of

other black individuals alleged to have been discriminated against, nor have they shown a

discriminatory policy or procedure of general application for the class they seek to certify that

satisfies the typicality requirement.

As to plaintiffs' claims of disparate impact, the court is aware that the purpose of

disparate impact law is to shift the burden to the employer where a facially neutral policy is

proven to have a significant impact on minorities. *See Teamsters,* 431 U.S. at 335-36 n.15;

*Fitzpatrick,* 2 F.3d at 1117.  Plaintiffs do not have to prove and the employer does not have to be

guilty of racial animus. *See Teamsters,* 431 U.S. at 335-36 n.15.  However, the Supreme Court

has stated:

> [T]he plaintiff's burden in establishing a prima facie case goes beyond the need to
> show that there are statistical disparities in the employer's work force.  The
> plaintiff must begin by identifying the specific employment practice that is
> challenged.  Although this has been relatively easy to do in challenges to
> standardized tests, it may sometimes be more difficult when subjective selection
> criteria are at issue.  Especially in cases where an employer combines subjective
> criteria with the use of more rigid standardized rules or tests, the plaintiff is in our
> view responsible for isolating and identifying the specific employment practices
> that are allegedly responsible for any observed statistical disparities. . . . Once the
> employment practice at issue has been identified, causation must be proved; that
> is, the plaintiff must offer statistical evidence of a kind and degree sufficient to
> show that the practice in question has caused the exclusion of applicants for jobs
> or promotions because of their membership in a protected group.  Our
> formulations, which have never been framed in terms of any rigid mathematical
> formula, have consistently stressed that statistical disparities must be sufficiently
> substantial that they raise such an inference of causation.

*Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994-95 (1988).  Plaintiffs have offered no

statistical evidence to enable the court to infer the existence of a pattern or practice affecting a

class of protected employees.  Plaintiffs have also failed to offer affidavits or other evidence

from employees within the proposed class alleging discrimination on the part of defendant.

Further, plaintiffs' disparate impact argument does not overcome the essentially individualized

nature of their claims.

After reviewing the evidence, the court is of the opinion that plaintiffs claims of disparate treatment are primarily individual claims of racial discrimination and do not support a class action. Plaintiffs worked in just six[26] *stores* out of the 125-160 *stores, warehouses, and service centers,* in fifteen states, which they seek to include in the class certification. "[W]hile typicality does not require a complete identity of claims, typicality may be defeated if factual differences dominate." *Hively,* 191 F.R.D. at 668. Typicality is not present if the class representatives are subject to unique defenses that could be central to the litigation. *Id.* (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir. 1990); *Bishop v. New York City Dep't of Housing Preservation and Development,* 141 F.R.D. 229, 238 (S.D. N.Y. 1992). As noted above, although plaintiffs share the common position of being black employees employed by defendant, their allegations are discrete and individualized. Plaintiffs were employed in different stores, in different states, in different departments, and at different levels within the company hierarchy. Their grievances are not susceptible to generalized proof or defenses.

Plaintiffs' claims do not arise from the same event, practice, or course of conduct, and there is wide variation in the legal theories on which their allegations are based. Plaintiffs have failed to identify a pattern or practice of discrimination that was present within the confines of

---

[26] Wright worked in the Irondale store in Birmingham, Alabama throughout his entire employment with Circuit City. (*See* DX D at 32-34, 45-46.) Whitter worked in the Durham, North Carolina store throughout her employment with Circuit City. (*See* Am. Compl. at ¶¶ 9, 82-84; DX E at 16.) Opie worked in two North Carolina stores, the Winston Salem store and the Greensboro store. (Am. Compl. at ¶ 7.) However, during the time in which Opie worked at these two stores, they were part of the Central Division, not the Southern Division. (*See* Am. Compl. at ¶ 65; DX F at 33.) Opie also worked at two stores in Atlanta, Georgia, the Memorial Drive store and the North Point store. (Am. Compl. at ¶ 7.)

the proposed class. Accordingly, the court is of the opinion that plaintiffs' claims are not typical of the potential class members' claims and, thus, plaintiffs have failed to satisfy Rule 23(a)(3).

### 4.   *Adequacy of representation*

In order to satisfy the "adequacy of representation" requirement, the court must determine: (1) that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit, and; (2) that the interest of the class representative is not antagonistic to or in conflict with other members of the class. *See Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985); *Meyer*, 106 F.R.D. at 361. Rule 23(a)(4) requires the movant to show that "the representative parties will fairly and adequately protect the interests of the class." *Buford*, 168 F.R.D. at 351. On its face, the adequacy requirement suggests some interplay with the commonality and typicality requirements. *See Wynn v. Dixieland Food Stores, Inc.*, 125 F.R.D. 696, 700 (M.D. Ala. 1989). As to the attorney-competence prong, the "adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced and generally able to conduct the proposed litigation." *Griffin*, 755 F.2d at 1533. The class attorney serves in "something of a position of public trust." *Piambino v. Bailey*, 757 F.2d 1112, 1144 & n.81 (11th Cir.1985), *cert. denied,* 476 U.S. 1169 (1986). "The class attorney has a fiduciary duty to the court as well as to each member of the class." *Buford,* 168 F.R.D. at 351-52 (citing *In re "Agent Orange" Product Liability Litigation*, 800 F.2d 14, 18 (2d Cir.1986)). Therefore, the class attorney is held to a very high standard of care during all phases of the litigation. *Id.* (citing *Piambino*, 757 F.2d at 1144).

The adequacy requirement also serves to "uncover conflicts of interest between named parties and the class they seek to represent." *Robinson v. Sears, Roebuck and Co.,* 111 F. Supp.

36

2d 1101, 1124 (E.D. Ark. 2000) (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citations and quotations omitted). In addition, class representatives should have "the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir. 1987).

Plaintiffs contend that "[t]he plaintiffs here are represented by attorneys who are 'qualified, experienced and generally able to conduct the proposed litigation,'" (Pls.' Br. at 18), and "it is clear that plaintiffs have no interests adverse to those of the absent class members and satisfy the adequacy of representation requirement," (*id.* at 21). Defendant asserts that both plaintiffs and plaintiffs' counsel are inadequate class representatives because (1) "none of the plaintiffs are current employees," (2) "Wright has plead guilty within the past two years to possession of a forged instrument," (3) plaintiffs "have only compounded the adequacy issues in the case" by withdrawing their class claims for compensatory and punitive damages, and (4) "counsel for Plaintiffs cannot escape the taint that these issues and others casts upon their own adequacy. They have selected plaintiffs with internally conflicting claims and no demonstrable interest in the injunctive relief they seek. In addition, they have asked the Court to believe that their exclusive focus on injunctive relief will cure any doubts about manageability, but they ignore the massive undertaking that would be required to determine if individual employees were entitled to some form of different promotion procedure." (Def.'s Br. at 37-38.)[27]

---

[27] The court finds that defendant's contention that plaintiffs' counsel do not qualify as adequate representatives in this case because they are motivated by their fee, (*see* Def.'s Br. at 4-5, 37-38), is without merit.

While the court has no reason to doubt the qualifications of plaintiffs' counsel, or their ability commit the necessary resources to class action litigation, the court is concerned that the interests of the class members differ in various ways from those of the putative class. In short, the court is of the opinion that the named plaintiffs are inadequate class representatives because the evidence fails to show that they possess the same interest and have suffered the same injury as the putative class.[28] Further, the court notes that none of the plaintiffs are current employees of defendant; in fact, all left the employ of defendant more than four years ago, (*see* Am. Compl. at ¶¶ 28, 70 83; DX D at 126, 138; DX F at 268), and have no ties to defendant or prospect of benefit from the injunctive relief they are seeking. Thus, the court is of the opinion that plaintiffs have failed to satisfy the adequacy of representation requirement under Rule 23(a)(4).

### 5.   *Conclusion*

This case is the "classic type with which courts are justifiably concerned over the very real danger of certifying a large class action which will thereafter most likely splinter into an unmanageable plethora of individualized claims." *Reyes v. Walt Disney World Co.*, 176 F.R.D. 654, 658 (M.D. Fla. 1998) (citing *Coon v. Georgia Pac. Corp.*, 829 F.2d 1563, 1566 (11th Cir. 1987); *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985)). As the proposed class in the

---

[28] The court agrees with defendant's contention that Wright's guilty plea to possession of a forged instrument impedes his credibility. Further, the court notes that the credibility of a witness is a potentially critical issue in any litigation, and that some courts have concluded that "[w]ithin the Court's sound discretion, class certification can be denied if there is a strong indication that one or more of the Plaintiffs' testimony 'might not be credible.'" *Hively.*, 191 F.R.D. at 668 (citing *Amswiss International Corp. v. Heublein, Inc.*, 69 F.R.D. 663, 671 (N.D. Ga. 1975)). However, "[i]f an employer could disqualify the representative of a class of his employees by merely raising a collateral attack on the representative's credibility, it is conceivable that no employee could ever qualify as a class representative in a [discrimination] action." *See Sheehan v. Purolator, Inc.*, 103 F.R.D. 641, 656 (E.D. N.Y. 1984).

instant case is presently defined, the representative plaintiffs share only one thing with all putative class members: their race.  Inasmuch as plaintiffs in the instant case have advanced across-the-board class allegations of race discrimination, the court concludes, based on the reasoning and authority of *Falcon* and its progeny, that plaintiffs have failed to satisfy the commonality and typicality requirements of Rule 23(a) as to their claims of disparate impact and disparate treatment.  Further, the court is of the opinion that plaintiffs cannot adequately represent the proposed class in this action.  Having concluded that plaintiffs fail to satisfy Rule 23(a), the court will not address the requirements of Rule 23(b).

### III.   CONCLUSION

Based on the foregoing analysis, the court is of the opinion that plaintiffs' Motion for Class Certification is due to be denied.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ⟨1st⟩ day of August, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

39